UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
GINAMARIE DIPAOLO KOEHLER,

                       Plaintiff,

         -against-

COMMISSIONER OF SOCIAL SECURITY,

                     Defendant.
-------------------------------------------------------------X

**OPINION AND ORDER**

20 Civ. 7707 (JCM)

      Plaintiff Ginamarie Dipaolo Koehler ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 405(g), challenging the decision of the Commissioner of Social Security ("Commissioner" or "Defendant"), which denied Plaintiff's application for disability insurance benefits, finding her not disabled within the meaning of the Social Security Act. (Docket No. 1). Presently before the Court are: (1) Plaintiff's motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, (Docket No. 17), and (2) the Commissioner's cross-motion for judgment on the pleadings, (Docket No. 19).[1]  For the reasons set forth herein, Plaintiff's motion is denied, and the Commissioner's cross-motion is granted.

## I.  BACKGROUND

      Plaintiff was born on June 25, 1982. (R.[2] 131[3]).  She filed an application for disability insurance benefits on April 27, 2018, alleging a disability onset date of August 25, 2015. (R. 131, 151).  Plaintiff's application was initially denied on July 11, 2018, (R. 67), after which Plaintiff requested a hearing, (R. 75-76), which was held on June 19, 2019, (R. 26).  Administrative Law

---

[1] This action is before the Court for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 13).

[2] Refers to the certified administrative record of proceedings ("Record") relating to Plaintiff's application for social security benefits, filed in this action on February 22, 2021. (Docket No. 14).

[3] All page number citations to the Record refer to the page number assigned by the Social Security Administration.

Judge ("ALJ") John Carlton ("ALJ Carlton") issued a decision on September 24, 2019, denying Plaintiff's claim. (R. 12-22). Plaintiff requested review by the Appeals Council, which denied the request on July 21, 2020, (R. 1-6), making the ALJ's decision ripe for review.

## A. Medical Records

### 1. Montefiore Medical Center[4]

On February 25, 2015, Plaintiff saw Dr. Mark Thomas in the Department of Physical Medicine and Rehabilitation at Montefiore Medical Center ("Montefiore") for fibromyalgia. (R. 197-99). The last time Plaintiff had been there was in October 2013. (R. 197). Plaintiff reported "ongoing left sided lateral thoracic pain" that was "sharp, catching" and localized "for 30 seconds to a few minutes." (*Id.*). The pain dissipated without medication and was not debilitating at the time, so Plaintiff was still able to continue all activities of daily living. (*Id.*). She reported that she had "good weeks and bad weeks" but that her fibromyalgia was "currently stable and controlled." (*Id.*). She worked 7-8 hours a day and stayed active, reportedly losing 30 pounds in the last year. (*Id.*). Upon examination, Plaintiff could not reproduce the pain on movements and exhibited full range of motion of the lumbar spine and shoulders, as well as full strength in her upper and lower extremities. (R. 198). Plaintiff's medical history included: "high blood pressure, fibromyalgia" for the past five years, obesity, myringotomy and tonsillectomy and adenoidectomy at age 5, "Abni pap 2007," tobacco use, and a knee joint fracture in 2012. (R. 197). Plaintiff was advised to do stretching exercises for her back, was given a prescription for Ativan, and was instructed to return if the pain continued. (R. 198).

On September 14, 2016, Plaintiff returned to Montefiore after she developed left elbow pain. (R. 200-03). Plaintiff reported that since her last visit her pain had been "bearable for a

---

[4] The Record consists of medical records from Montefiore Medical Center from August 1, 2014 to March 26, 2019. (R. 194-215, 809-32).

while," and the Ativan helped maintain "good control of anxiety as well as muscle spasm." (R. 200). The pain in her left elbow started two weeks prior to her visit without any inciting trauma and felt "as if rip[p]ing apart muscles," which was aggravated when she bent her elbow. (*Id.*). Plaintiff reported that the pain was alleviated when she applied a heating pad, took naproxen, extended her elbow, or "dangl[ed]" her bilateral upper extremity. (*Id.*). Plaintiff also reported numbness in her left big toe, waxing and waning over the last year and a half. (*Id.*). Upon examination, Plaintiff had normal range of motion in all extremities with no erythema or edema, but had positive tenderness at the "lateral tibial tuberosity, pes anserine, medial and lateral epi[c]ondyles bilaterally including L olecr[a]non bursa." (R. 202). Dr. Thomas's impression was "left olecranon bursitis and chronic paresthesia of L 1 toe and MTP [metatarsophalangeal] with unknown etiology." (*Id.*). The medical records noted a "history of obesity (BMI 36.34), PCOS insulin resistance, HTN, fibromyalgia," (R. 200), and the doctor noted her medical history as: "FMS, PCOS, obesity, infertility," (R. 202). Plaintiff was prescribed Vitamin D and naproxen; a trial of Cymbalta was discussed but Plaintiff declined because she was planning intrauterine insemination. (*Id.*).

On November 4, 2016, Plaintiff presented at Montefiore with lower back pain. (R. 204-05). Her elbow pain appeared to have resolved itself, (R. 207), but Plaintiff developed a constant, stabbing pain in her lower back on the left side after suddenly moving her neck to the right. (R. 205). Upon examination, Plaintiff had normal range of motion but there was "[i]ncreased tone and trigger point" noted on the left side of the spinal muscles. (R. 206). To alleviate the pain, Plaintiff received a trigger point injection in her lower back. (R. 204, 207). Plaintiff's medical history remained the same. (R. 205, 207). Plaintiff was instructed to continue taking naproxen for pain, to start the Cymbalta trial, and to return in a month. (R. 207).

On June 21, 2017, Plaintiff had a follow-up appointment; at that time, she was seven weeks pregnant and reported that her fibromyalgia pain was "stable and tolerable." (R. 208). The previous injection "really helped" with the pain. (*Id.*). Plaintiff reported that she stopped taking most of her medications due to her pregnancy, and was exhausted from the pregnancy and fibromyalgia, but remained "functional" and "active." (*Id.*). Upon examination, Plaintiff had full range of motion of her upper extremities and diffuse tenderness on her neck, back, arms and legs. (R. 210). She was positive for musculoskeletal issues, including myalgias, back pain, arthralgias and neck pain, but had no joint swelling or gait problems. (R. 209). Plaintiff's medical history was unchanged. (R. 208, 210). Dr. Thomas explained to Plaintiff that "fatigue is common during pregnancy and with fibromyalgia," and Plaintiff was encouraged "to talk about it and try to relax." (R. 210). Plaintiff indicated she wanted to explore the option of applying for disability, but after discussion, decided to wait to apply and focus on her pregnancy. (*Id.*). Plaintiff was also instructed to continue pre-natal care and return as needed. (*Id.*).

On April 13, 2018, Plaintiff presented for follow-up "with mild symptoms [o]f pain" after giving birth to her son. (R. 212, 214). She reported that she did relatively well during pregnancy without fibromyalgia exacerbation; however, after giving birth she experienced "related exacerbation of diffuse and severe myofascial pain for the subsequent 2 weeks." (R. 212). Plaintiff experienced residual fatigue and noted that "when not doing what is necessary for her infant . . ., her muscle tighten[ed] throughout and she ha[d] pain." (*Id.*). Her fibromyalgia pain was "stable and tolerable with occasional myalgias," and she "manage[d] to be functional [and] be active" with her infant. (*Id.*). Upon examination, she had full range of motion of her upper extremities. (R. 214). There was no change to Plaintiff's medical history. (R. 212, 214). Plaintiff was newly prescribed Zanaflex and instructed to return to clinic in three months. (R.

214).  Plaintiff received prescriptions for various medications to help with her muscle spasm,

fibromyalgia and anxiety on May 11, 2018, June 21, 2018, July 17, 2018, July 18, 2018, August

7, 2018, October 29, 2018 and February 4, 2019. (Docket No. 18 at 13-14[5]; Docket No. 20 at 9)

(citing R. 809-29).

## 2.  Westmed Medical Group[6]

Plaintiff saw Dr. Joshua Waldman at Westmed Medical Group ("Westmed") for

intrauterine insemination and to oversee her pregnancy and childbirth.  On June 14, 2017, June

27, 2017, and July 3, 2017, Plaintiff had obstetric ultrasound scans at Westmed. (R. 335-40).  On

July 3, 2017, Plaintiff's pregnancy was confirmed. (R. 335).[7]

Plaintiff's obesity was noted throughout these records.  For example, Plaintiff's August 4,

2017 Obstetric Ultrasound Report noted a Body Mass Index ("BMI") of 40, and explained that

"[o]besity, defined as a body mass index (BMI) of >30 kg/m2, is now recognized as a major

disease in the western world. ~30% of women meet obesity criteria, & the prevalence of morbid

obesity (defined as a BMI of >40 kg/m2 or a BMI of >35 kg/m2 w/ obesity comorbidity) is

increasing." (R. 333).  The report included several recommendations on how to handle the

pregnancy given Plaintiff's morbid obesity. (*Id.*). The report also noted medical history

"significant for possible CHTN," or chronic hypertension, with "mild HTN (BP 140/90) noted at

prenatal visit on 7/18/17, w/o current use of antihypertensive." (R. 333).  In addition, on

September 29, 2017, Plaintiff had another obstetric ultrasound, which noted the same concerns

---

[5] All page citations to the parties' briefs refer to the page numbers assigned upon the electronic filing of the documents.

[6] The medical records from Westmed Medical Group are from September 7, 2016 through March 21, 2019. (R. 270-808).

[7] Most of the Westmed medical records are gynecological reports and notes relating only to Plaintiff's pregnancy and intrauterine insemination efforts. Since these records are not relevant to Plaintiff's disability claims, they are not included in this summary.

regarding Plaintiff's BMI and CHTN. (R. 329-31).  Updated recommendations were included. (R. 331).

On October 30, 2017, Dr. Waldman received a letter from Dr. Thomas, which discussed Plaintiff's history of pain and disability due to fibromyalgia and recommended considering a cesarean section for delivery. (R. 296).  Dr. Thomas explained that Plaintiff's disease was generally well managed "but quickly exacerbate[d] in instances of muscle overuse or severe stress," to such a degree that the pain resulted in her inability to perform many basic and instrumental activities of daily living. (*Id.*).  Dr. Thomas wrote that Plaintiff had expressed concerns that her upcoming labor and delivery would "precipitate a fibromyalgia crisis," and that in his experience Plaintiff has been "accurate in identifying actual and potential triggers for her disease." (*Id.*).  Plaintiff consented to a cesarean section, and Dr. Waldman successfully delivered her baby on February 2, 2018. (R. 319-20).

## B.  Medical Opinions

### 1.  Mark Thomas, MD

Dr. Mark Thomas has been Plaintiff's treating physician since 2008.  On August 6, 2018, Dr. Thomas completed: (1) a Fibromyalgia Impairment Questionnaire ("FIQ"), (R. 216-18), and (2) a Medical Source Statement ("2018 Medical Source Statement"), (R. 219-24).  On May 9, 2019, Dr. Thomas completed another Medical Source Statement ("2019 Medical Source Statement"). (R. 833-38).

Dr. Thomas wrote in the FIQ that Plaintiff's date of first treatment was May 28, 2008 and that her impairment had lasted for at least twelve months. (R. 216-17).  He described Plaintiff's prognosis as "guarded," and noted that Plaintiff experienced widespread pain, with a severity of

10 out of 10 at its peak, and had all the possible tender points[8] except for one (right elbow). (R. 216). "Fatigue, heavy load, and stress" were precipitating factors leading to pain. (*Id.*). Dr. Thomas listed four medications and two devices that Plaintiff used to help alleviate symptoms and noted that side effects included sedation and "GI upset." (R. 217). Dr. Thomas indicated that Plaintiff's symptoms were severe enough to interfere with attention and concentration frequently, and that Plaintiff would be unable to retain functional ability to work full-time (8 hours a day, 5 days a week) in a competitive environment, in even a sedentary occupation. (*Id.*). He further stated that Plaintiff would likely be absent from work more than three times a month because of the impairments or treatments. (R. 218). He also opined that Plaintiff would be limited in her ability to work at a regular job on a sustained basis because she would need to avoid repetitive strain and she experienced medication side effects. (*Id.*). Dr. Thomas noted that Plaintiff did not have to "use a cane or other assertive devi[c]e" to stand or walk, that she did not have significant limitations in doing repetitive reaching, handling or fingering, and she would be able to frequently lift 1-5 pounds, and occasionally lift 6-10 pounds. (*Id.*). Dr. Thomas stated that the earliest date Plaintiff experienced the symptoms and limitations he described in the FIQ was 2006. (R. 217).

In the 2018 Medical Source Statement, Dr. Thomas reported that Plaintiff had been diagnosed with fibromyalgia, myalgia, myositis, Vitamin D deficiency, esophageal reflux, HTN, and insulin resistant polycystic ovary syndrome (PCOS), and that he had seen Plaintiff three to eight times per year "since diagnosis" in May 2008. (R. 219). Dr. Thomas described Plaintiff's symptoms as "diffuse" and "daily aching to sharp pain," pain in the "axial myofascial and appendicular (joints)" that range in pain from 0 to 10 in severity, "severe fatigue," "poor

---

[8] "Tender points" are also referred to as "trigger points" by Plaintiff and the Record. The Court adopts "trigger points" for the remainder of this Opinion.

endurance," and "movement and activity related pain." (*Id.*).  Dr. Thomas recorded symptoms consistent with the FIQ, including that (a) Plaintiff's pain was exacerbated by activity, fatigue and stress, (b) Plaintiff's ability to deal with work stress was moderately limited, and (c) Plaintiff's experience of pain was severe enough to frequently interfere with attention and concentration. (R. 219-20).  Plaintiff exhibited signs of impaired sleep, tenderness, trigger points and muscle spasms, and Dr. Thomas noted that focal inflammatory findings were intermittent with temporary positive findings on provocative exam. (R. 219).  Again, medication used to alleviate the pain had side effects of "sedation (drowsiness) and GI (stomach) upset." (R. 220). Dr. Thomas opined that in a work setting, Plaintiff would need to switch between sitting and standing every fifteen minutes or less, and in a cumulative eight-hour workday, could sit for a total of three hours and stand or walk for only two hours. (R. 220-21).  However, Dr. Thomas indicated that Plaintiff did not need to rest in a supine position during the workday. (R. 221).  As before, Dr. Thomas noted that Plaintiff would be able to frequently lift 1-5 pounds and occasionally lift 6-10 pounds. (R. 222).  Dr. Thomas stated that Plaintiff's condition existed and persisted with these restrictions since 2008. (R. 224).

Dr. Thomas provided updated and additional information in his 2019 Medical Source Statement regarding Plaintiff's diagnoses and limitations. (R. 833-38).  Dr. Thomas noted that, starting in 2013, he saw Plaintiff two to three times per year for office evaluation, treatment, and supervision of physical therapy. (R. 833).  The 2019 Medical Source Statement included two additional diagnoses (chronic lower back pain and a history of carpal tunnel syndrome), and three additional symptoms (joint pain "with frequent acute exacerbations," activity intolerance, and anxiety). (*Id.*).  Dr. Thomas also identified for the first time that anxiety was affecting Plaintiff's pain, (R. 834), and stated that Plaintiff's pain was "highly variable," and got worse for

up to six weeks about four times per year. (R. 833).  Plaintiff also began exhibiting abnormal

posture and an abnormal gait, but she no longer exhibited issues with trigger points. (*Id.*).

Plaintiff's pain was severe enough to interfere with her attention and concentration "often," and

she now had "marked limitation[s]" with her ability to deal with work-related stress. (R. 834).

Furthermore, Dr. Thomas opined that Plaintiff would only be able to stand or walk for about an

hour during an eight-hour workday and would need a total of three hours to rest in a supine

position during breaks scheduled at approximately two-hour intervals so as to relieve pain and

fatigue. (R. 835-36).  Dr. Thomas now concluded that Plaintiff could only occasionally lift 1-5

pounds and would have difficulty balancing. (R. 836).  Dr. Thomas stated that Plaintiff's

condition existed and persisted with the restrictions outlined in the 2019 Medical Source

Statement since 2013. (R. 838).

## 2.  S. Ahmed, MD

Dr. Ahmed, the State agency medical consultant, submitted a Residual Functional

Capacity ("RFC") form on July 11, 2018. (R. 58-66).  Dr. Ahmed reviewed Plaintiff's medical

records and determined that Plaintiff had two medically determinable impairments ("MDI"):

fibromyalgia (severe) and anxiety and obsessive-compulsive disorders (non-severe). (R. 61).  Dr.

Ahmed noted that Plaintiff complained of three symptoms — pain, weakness, and fatigue — and

opined that one or both of Plaintiff's impairments could reasonably be expected to produce her

symptoms. (R. 63).  Dr. Ahmed further opined that Plaintiff's statements about the intensity,

persistence, and functionally limiting effects of the symptoms were substantiated by the

objective medical evidence. (*Id.*).

Dr. Ahmed determined that Plaintiff's RFC was "light," (R. 65), and she was capable of

standing/walking about six hours, sitting about six hours, and lifting 20 pounds occasionally and

10 pounds frequently. (R. 63).  Dr. Ahmed also set forth the following in support of his findings: claimant has a history of fibromyalgia since 2015; in February 2015, Plaintiff had full range of motion and strength was normal; in November 2016, Plaintiff received an injection in her lower back for myofascial pain and muscle strain; in June 2017, Plaintiff reported that the injection greatly helped her pain, and she had full range of motion (FROM), diffuse tenderness on neck, back and arms, 5/5 strength, and steady gait; in April 2018, Plaintiff said that her fibromyalgia was stable with occasional migraines, normal gait, FROM, 5/5 strength, and BMI 36.34; and Plaintiff's activities of daily life (ADL) included taking care of her infant son, preparing food, driving, shopping and walking approximately 10 minutes. (R. 64).

**C.  Plaintiff's Testimony**

Plaintiff was represented by Erica Bulo, Esq. ("Bulo") at the June 19, 2019 hearing before ALJ Carlton. (R. 26).  In her opening statement, Bulo stated that Plaintiff suffers from "fibromyalgia, vitamin D deficiency, reflux, hypertension, insulin resistance, . . . PCOS," and "carpal tunnel syndrome," and that "[t]his combination of medical problems has left her unable to engage in substantial gainful activity." (R. 29-30).

During her testimony, Plaintiff requested permission to stand because she was uncomfortable sitting. (R. 36).  The ALJ allowed her to sit and stand as needed throughout the hearing. (*Id.*).

Plaintiff testified that over the last fifteen years, she had worked in various administrative positions, as an office manager, bookkeeper, and staff manager, among others. (R. 31-36).  She stated that in her more recent roles, the heaviest thing she would lift, carry, push, or pull was a thick file folder. (R. 32-33).  These jobs required a combination of sitting and standing, and she did not have to lift objects over five pounds. (R. 33-35).

10

Plaintiff further explained that she was laid off from her last job in August 2015 after she struggled to meet her required work hours. (R. 37).  She testified that her fibromyalgia was bad and that the related fatigue was "overwhelming," which caused her to (1) arrive to work late; (2) leave work early; and (3) call out sick one to two times a week. (R. 37-38).  She described struggling to get to work on time because her hip hurt, and she could not move her leg to drive. (*Id.*).  In addition, she said that she did not "feel strong enough" to take public transportation alone. (R. 48).

Plaintiff testified that she attended cosmetology school full-time from January to August of 2016. (R. 43).  She said that the school accommodated her disabilities and worked with her so she could complete the program. (R. 43-44).  For instance, when her carpal tunnel was bad and she had trouble writing, the school would make photocopies of class notes for her. (R. 44).  The school also permitted her to stand and sit as needed in class, take as many breaks as she needed throughout the day, and to miss several days as well. (*Id.*).  Plaintiff explained that she decided to go to cosmetology school because she could not find an employer who would allow her the type of flexibility she felt she needed because of her fibromyalgia, and she thought the cosmetology industry would allow her to work on her own schedule without having to "be at work or in an office 9:00 to 5:00." (*Id.*).  After graduation, she did not pursue this line of work because "everything went bad and my sickness got worse than it's ever been." (R. 45).

At the hearing, Plaintiff described her experience with fibromyalgia and said that when she was initially diagnosed, the medication allowed her to work, but then it stopped helping, and beginning in 2017, her fibromyalgia worsened significantly. (R. 38-40).  She testified that prior to 2015, "as unbearable as it was, [she] was still managing to get to work even if it was late and leaving early." (R. 40).  However, in 2017, "[i]t was unmanageable . . . most times," requiring "a

lot more medication to manage . . . daily function[s]." (*Id.*).  Plaintiff explained that she had

"trigger points," which caused very sharp pains when she took a step. (R. 41).  She noted that she

previously received injections for the pain, but no longer needed them because she had

"somewhat controlled" the "trigger points" with medication. (R. 41-42).  Plaintiff testified that

she experienced pain every day from the fibromyalgia and rated the pain at an 8 to 10 out of 10.

(R. 42).  The ALJ questioned Plaintiff about Dr. Thomas's notes from 2017 that stated that

Plaintiff's pain was "generally well managed" with "periods of time where it would get worse."

(*Id.*).  Plaintiff responded that she did not know what Dr. Thomas meant by "managed," but

surmised that he might have meant that she "managed as far as [she] was still physically

working" or that "[h]e meant medication managed." (R. 43).  The ALJ also inquired about her

carpal tunnel syndrome. (R. 45).  She testified that she was not receiving treatment for it, and she

used a brace "that helped [her]… a bit and that was really all [she] did for it." (*Id.*).

Finally, Plaintiff testified about her typical day. (R. 46-47).  She testified that she could

only sit and stand for ten to fifteen minutes at a time, spending most of her day laying down

instead. (R. 48-49).  She said she was unable to lift her baby without assistance, (R. 48), and

explained that a family member or friend came to her home daily to assist her with her sixteen-

month-old son. (R. 46).  She could drive her car and go grocery shopping when necessary, (R.

47-48), but there were times she missed appointments because she was in too much pain. (R. 49).

She said that her medications caused her "drowsiness and exhaustion" and "acid reflux." (*Id.*).

## D.  The Vocational Expert's Testimony

Vocational Expert ("VE") Edward Hopkins ("Hopkins") testified that he reviewed

Plaintiff's file and was familiar with Plaintiff's vocational background. (R. 49-56).  VE Hopkins

identified Plaintiff's past relevant work as "Medical secretary" (201.362-014), "Medical clerk"

(205.362-018), and "Medical records supervisor" (079.167-014). (R. 51).  He testified that the

medical secretary and medical clerk jobs are generally performed at a sedentary exertion level

and the medical records supervisor is generally performed at a light exertion level. (*Id.*).

The ALJ posed a hypothetical to VE Hopkins, asking him to assume an individual of

Plaintiff's age, education and vocational history, with the following limitations:

> light work, can't work on ladders, ropes or scaffolds, or on slippery, uneven
> surfaces . . . can occasionally use ramps and stairs . . . can occasionally balance,
> stoop, crouch, crawl, and kneel . . . can't work at unprotected heights or around
> dangerous machinery, and they cannot operate a motor vehicle as a condition of
> their employment . . . [This individual is limited] to no more than frequent
> fingering, feeling, and handling bilaterally.

(R. 52).  VE Hopkins testified that such an individual could perform all of Plaintiff's past

relevant work as medical secretary, medical clerk, and medical records supervisor. (R. 53).  He

also stated that if the exertion level in the hypothetical changed from "light work" to "sedentary,"

the individual would still be able to "do the medical secretary and medical clerk job[s]." (*Id.*).

The ALJ modified the hypothetical and asked VE Hopkins to assume the same individual

but with the additional limitation that the individual could only do simple and routine work not

done at a production rate pace. (R. 53).  VE Hopkins testified that it would "eliminate all the past

work" as viable options, but that such an individual could work as a "light level cashier II,"

"Order caller," or "Cleaner housekeeping," instead. (R. 53-54).  The ALJ then modified the

hypothetical again and asked VE Hopkins what work would be available to the same individual

with the additional limitation of being able to sit or stand for 20 minutes and needing to switch

between the two throughout the day. (R. 54).  VE Hopkins testified that the individual could

perform the jobs of "Order caller," "Marker," and "Storage facility rental clerk." (*Id.*).

The ALJ then posed a series of questions for VE Hopkins regarding how much time an

individual working a full-time "40-hour work week[,] eight hours a day, five days a week with a

30-minute meal break . . . and two 15-minute breaks . . ." competitive employment could go "off task" or miss work before being fired. (R. 54-56). VE Hopkins answered that, according to statistics from the Bureau of Labor, the expectation is that an individual would not be off task for more than 15% of the workday. (R. 54-55). Upon further questioning by Plaintiff's attorney, VE Hopkins confirmed that if an individual were "on task for two hours and then the third hour, they were off task for 18 minutes," that individual would not be able to hold the job. (R. 56). VE Hopkins also explained that for the jobs available to Plaintiff, the individual could not take any unscheduled days off during the first 90-day probationary period, and just one unscheduled day off per month after the end of the 90-day probationary period. (R. 55-56).

**E.  The ALJ's Decision**

In his July 11, 2018 decision, ALJ Carlton determined that Plaintiff met the insured status requirements of the Social Security Act ("Act") through December 31, 2020. (R. 17). ALJ Carlton then applied the five-step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. §§ 404.1520(a) (2012) and 416.920(a) (2012). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 25, 2015, the alleged disability onset date. (R. 17).

At step two, the ALJ found that Plaintiff had the following severe impairments: fibromyalgia and obesity. (*Id.*) The ALJ further found that Plaintiff's hypertension and anxiety were non-severe impairments. (R. 17-18). The ALJ noted Plaintiff's allegation of a history of carpal tunnel syndrome but found that there was "no evidence of diagnosis [or] treatment in the file," and therefore was not an MDI. (R. 18). The ALJ also concluded that "[e]ven if a diagnosis was properly documented, the evidence does not demonstrate any limitations resulting from this impairment." (*Id.*).

14

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (R. 18-19). The ALJ specifically considered the listings under 1.00 (Musculoskeletal System), and he considered obesity pursuant to Ruling 19-2p. (*Id.*). The ALJ determined that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations: (1) occasionally climb stairs and ramps, (2) occasionally balance, stoop, kneel, (3) cannot work on ladders, ropes or scaffolds or on uneven surfaces, (4) cannot use or operate dangerous machinery, (5) cannot operate a motor vehicle as a condition of employment, and (6) can frequently finger, feel and handle bilaterally. (R. 19). In arriving at the RFC, the ALJ first determined that although Plaintiff's MDIs could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*).

In assessing the medical opinions, the ALJ found Dr. Ahmed's opinion "persuasive," but found all three of Dr. Thomas's opinions "not persuasive." (R. 21). The ALJ determined that Dr. Thomas's opinion in Exhibit 2F was not persuasive because Dr. Thomas stated that Plaintiff's "symptoms and limitations [were] work-preclusive since 2006, but [Plaintiff] continued working at substantial gainful activity levels and above up until 2015 (2F)." (*Id.*). The ALJ further explained that Dr. Thomas's opinion in Exhibit 3F[9] was not persuasive because the "degree of limitation described" in the medical source statement was not supported by Plaintiff's treatment records showing general stability and no significant exacerbation. (*Id.*). In addition, the ALJ

---

[9] ALJ refers to "exhibit 5F," but both parties discuss Exhibit 3F (R. 219-23) in reference to Dr. Thomas's first medical source statement and second opinion. (Docket No. 18 at 21; Docket No. 20 at 20, n.7).

concluded that Dr. Thomas's opinion in Exhibit 8F was not persuasive because it included "some objective signs, such as abnormal posture and gait, that are contradicted by the medical records and were not included in other opinion forms." (*Id.*).  Moreover, the ALJ explained that the limitations described in Exhibit 8F that Dr. Thomas stated started in 2013 were inconsistent with the fact that Plaintiff was able to work full-time until 2015. (*Id.*).

Finally, the ALJ determined that Plaintiff was able to perform her past relevant work as medical secretary, medical clerk, and medical records supervisor, which the VE testified were jobs that could be performed within Plaintiff's RFC. (*Id.*).  The ALJ therefore concluded that Plaintiff was not disabled under the Act. (R. 21-22).

## II.  LEGAL STANDARDS

### A.  "Disability" Under the Act

A claimant is disabled if she "is unable . . . 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729.F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)).

The Social Security Administration ("SSA") has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)); 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v).

The claimant has the general burden of proving that they are statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d. 443, 445 (2d Cir. 2012).

## B. Standard of Review

When reviewing an appeal from a denial of disability insurance benefits, the court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's or "determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)).

Such a deferential standard, however, is not applied to the Commissioner's conclusions of law. Where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). Therefore, the court must independently determine if the Commissioner applied the correct legal standards in determining that plaintiff was not disabled. "Failure to apply the correct legal standards is grounds for reversal." *Pollard*, 377 F.3d at 189. "Where

there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the evidence" is appropriate. *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## C.  The RFC Assessment

The RFC is "the most [a person] can still do despite [their] limitations." 20 C.F.R. § 404.1545(a)(1) (2012).  "The claimant's RFC is determined based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, objective medical evidence, and medical opinions from treating and consulting sources." *Rivera v. Comm'r of Soc. Sec.,* 368 F. Supp. 3d 626, 640 (S.D.N.Y. 2019).  When determining the RFC, the ALJ considers "a claimant's physical abilities, mental abilities, [and] symptomatology, including pain and other limitations that could interfere with work activities on a regular and continuing basis." *Weather v. Astrue*, 32 F. Supp. 3d 363, 376 (N.D.N.Y. 2012) (citing 20 C.F.R. § 404.1545(a)).  Importantly, an "RFC determination must account for limitations imposed by both severe and nonsevere impairments." *Parker-Grose v. Astrue,* 462 F. App'x 16, 18 (2d Cir. 2012) (summary order).

In deciding a disability claim, an ALJ must "weigh all of the evidence available to make an RFC finding that is consistent with the record as a whole," even if that finding does not "perfectly correspond" with any of the medical source opinions cited in their decision. *Negron v. Saul*, 19 Civ. 07547 (KMK)(JCM), 2021 WL 465768, at *17 (S.D.N.Y. Feb. 8, 2021), *report and recommendation adopted*, 2021 WL 1254426 (S.D.N.Y. Apr. 5, 2021) (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (summary order)).  However, because an ALJ is not a medical professional, he must refrain "from 'playing doctor' in the sense that he "may not

substitute his own judgment for competent medical opinion." *Quinto v. Berryhill*, CIVIL

ACTION NO. 3:17-cv-00024 (JCH), 2017 WL 6017931, at *12 (D. Conn. Dec. 1, 2017)

(internal quotations omitted); *see also Heather R. v. Comm'r of Soc. Sec.*, 1:19-CV-01555

(EAW), 2021 WL 671601, at *3 (W.D.N.Y. Feb. 22, 2021).   Accordingly, where the record

shows that the claimant has more than "minor physical impairments," *Jaeger-Feathers v.*

*Berryhill*, 1:17-cv-06350 (JJM), 2019 WL 666949, at *4 (W.D.N.Y. Feb. 19, 2019), an ALJ is

not qualified "to assess residual functional capacity on the basis of bare medical findings,"

*Kinslow v. Colvin*, Civil Action No. 5:12–cv–1541 (GLS/ESH), 2014 WL 788793, at *5

(N.D.N.Y. Feb. 25, 2014).

Furthermore, an ALJ's findings "must specify the functions plaintiff is capable of

performing; conclusory statements regarding plaintiff's capacities are not sufficient." *Rosado v.*

*Barnhart*, 290 F. Supp. 2d 431, 441 (S.D.N.Y. 2003) (quotation and citation omitted).   "The RFC

assessment must also include a narrative discussion, describing how the evidence supports the

ALJ's conclusions, citing specific medical facts, and non-medical evidence." *Brian Z. v. Comm'r*

*of Soc. Sec.*, 5:20-CV-737 (ATB), 2021 WL 3552525, at *4 (N.D.N.Y. Aug. 11, 2021) (citation

omitted).

## III. DISCUSSION

Plaintiff argues that remand is warranted because: (1) the ALJ's RFC finding is not

supported by substantial evidence because he did not properly consider Plaintiff's treating

physician's opinions, her obesity, and the amount of time she would be absent from work, and

(2) the ALJ failed to properly evaluate Plaintiff's subjective statements. (Docket No. 18 at 14-

28).   Defendant counters that the ALJ's determination that Plaintiff is not disabled is supported

by substantial evidence with all required considerations taken and, thus, should be affirmed.
(Docket No. 20 at 14-29).  The Court will address each argument in turn.

## A. ALJ's Duty to Develop the Record

As a threshold question, the court must determine "[w]hether the ALJ has satisfied [their]
duty to develop the record." *Smoker v. Saul*, 19-CV-1539 (AT) (JLC), 2020 WL 2212404, at *9
(S.D.N.Y. May 7, 2020).  "Because a hearing on disability benefits is a non-adversarial
proceeding, the ALJ generally has an affirmative obligation to develop the administrative
record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citing *Echevarria v. Sec'y of Health &
Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).  The regulations define "complete medical
history" to mean, at a minimum, "the records of [a claimant's] medical source(s) covering at
least the 12 months preceding the month in which" a claim is filed. 20 C.F.R. §§ 404.1512(b)(ii)
(2017), 416.912(b)(1)(ii) (2017).  "This duty is present even when a claimant is represented by
counsel." *Atkinson v. Barnhart*, 87 F. App'x 766, 768 (2d Cir. 2004).  "Where there are gaps in
the administrative record, remand to the Commissioner for further development of the evidence"
is appropriate. *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997).  "[W]here there are
no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete
medical history,' the ALJ is under no obligation to seek additional information in advance of
rejecting a benefits claim." *Rosa*, 168 F.3d at 79 n.5 (citing *Perez*, 77 F.3d at 48); *see also
Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013).

Here, the Court finds that there are no obvious gaps in the record.  The record consists of
extensive medical records from Montefiore, (R. 194-215, 809-32); Westmed, (R. 270-808);
superfluous medical records from Plaintiff's OB-GYN physicians (R. 225-69); medical opinions
from the treating physician, Dr. Thomas, (R. 216-24, 833-38); medical opinion from the State

agency medical consultant, Dr. Ahmed, (R. 58-66); Vocational Expert's testimony, (R. 49-56); Plaintiff's testimony, (R. 30-49); and Plaintiff's function report, (R. 165-72).  These records span from 2014 to 2019, covering more than the required 12 months prior to April 2018. Furthermore, Plaintiff's attorney stated at the hearing that there was no evidence missing and that she had no objections to the evidence on any grounds. (R. 29, 57). *See David B. C. v. Comm'r of Soc. Sec.*, 1:20-CV-01136 (FJS/TWD), 2021 WL 5769567, at *7 (N.D.N.Y. Dec. 6, 2021) (finding that the ALJ fulfilled her duty to develop the record where "Plaintiff did not object to the contents of the record or identify any gaps that need to be filled… In fact, Plaintiff's counsel affirmatively stated the record was complete.").

Plaintiff argues that the ALJ failed to discharge his affirmative duty to develop the record, by failing to recontact Dr. Thomas before rejecting his medical opinion or to request a consultative examination. (Docket No. 18 at 22-23).  The Court finds that the ALJ did not violate his duty to develop the record because the record was complete and there was no ambiguity or conflict in the treatment notes that needed clarification. *See infra* Section III.B.1.

**B.  The ALJ's RFC Findings**

When determining a claimant's RFC, "an ALJ must consider all medical opinions" received. *Manzella v. Comm'r of Soc. Sec.*, CIVIL ACTION NO. 20 Civ. 3765 (VEC) (SLC), 2021 WL 5910648, at *11 (S.D.N.Y. Oct. 27, 2021), *report and recommendation adopted*, 2021 WL 5493186 (S.D.N.Y. Nov. 22, 2021).  "A medical opinion is a statement from a medical source about what [a claimant] can still do despite [his or her] impairment[s] and whether [the claimant] ha[s] one or more impairment-related limitations or restrictions in ... [the claimant's] ability to perform [the physical and mental] demands of work activities." 20 C.F.R. § 404.1513(a)(2) (2017).

On January 18, 2017, the SSA issued comprehensive revisions to the regulations that govern the evaluation of medical opinions for claims filed on or after March 27, 2017. *See* 82 Fed. Reg. 5,844 (Jan. 18, 2017).  The new regulations end the treating physician rule and no longer require the ALJ to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion[s], . . . including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a) (2017); *see Manzella*, 2021 WL 5910648, at *11.  Instead, the ALJ must consider all of the medical opinions and determine how persuasive he finds them. *See* 20 C.F.R. § 404.1520c(b).  In conducting this evaluation, the ALJ must consider five factors: (1) supportability, (2) consistency, (3) the medical source's relationship with the claimant, (4) the medical source's specialization, and (5) any "other factors that tend to support or contradict a medical opinion." *Id*. § 404.1520c(c)(1)-(5).

The first two factors—supportability and consistency—are the "most important" in determining how persuasive an ALJ finds a medical source's opinions. *Id.* § 404.1520c(b)(2). As a result, the ALJ must "explain how [he] considered the supportability and consistency factors," but is not required to explain how he considered the remaining factors. *Id.*  With respect to supportability, the new rule provides that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).  "Simply put, supportability is an inquiry confined to the medical source's own records that focuses on how well a medical source supported and explained their opinion." *Vellone ex rel. Vellone v. Saul*, 1:20-cv-00261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).  With respect to

consistency, the new regulations provide that the more consistent a medical opinion is with other evidence in the medical record, the more persuasive it will be. 20 C.F.R. § 404.1520c(b)(2). "[C]onsistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Vellone*, 2021 WL 319354, at *6.

"If the ALJ fails adequately to explain the supportability or consistency factors, or bases [his] explanation upon a misreading of the record, remand is required." *Rivera v. Comm'r of Soc. Sec. Admin.*, 19-CV-4630 (LJL) (BCM), 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (internal quotation and citation omitted).  An ALJ is "not required to articulate how [he] considered each medical opinion . . . from one medical source individually." 20 C.F.R. § 404.1520c(b)(1).

### 1.  The ALJ's Consideration of the Medical Opinions

Here, the record included medical opinions from Dr. Thomas and Dr. Ahmed.  Dr. Thomas was Plaintiff's treating physician since 2008, working with Plaintiff to tailor treatment and pain management plans.  Dr. Thomas submitted three assessments: an FIQ,[10] the 2018 Medical Source Statement,[11] and the 2019 Medical Source Statement.[12]  (R. 216-24, 833-38). Dr. Ahmed was the State agency medical consultant who submitted an RFC form based on his review of the medical records. (R. 58-66).

The ALJ found Dr. Ahmed's opinion persuasive and Dr. Thomas's three opinions "not persuasive." (R. 21).  Plaintiff argues that the Commissioner erred in finding Dr. Thomas's

---

[10] The ALJ's decision refers to the FIQ as exhibit 2F, (R. 21), as labeled in the List of Exhibits, (R. 23-25).

[11] The ALJ's decision refers to the 2018 Medical Source Statement as exhibit 5F. (R. 21).  Parties agree that the ALJ mislabeled the 2018 Medical Source Statement as exhibit 5F, when it was supposed to be exhibit 3F, as labeled in the List of Exhibits. (Docket No. 18 at 21; Docket No. 20 at 20, n.7).

[12] The ALJ's decision refers to the 2019 Medical Source Statement as exhibit 8F, (R. 21), as labeled in the List of Exhibits, (R. 23-25).

opinions not persuasive and in relying solely on the opinions of Dr. Ahmed. (Docket No. 18 at

15-23).  In his decision, the ALJ rejected all three assessments completed by Dr. Thomas. (R.

21).  The ALJ rejected the FIQ because Dr. Thomas concluded that the symptoms and limitations

listed on the FIQ precluded Plaintiff from working since 2006, but Plaintiff worked "at

substantial gainful activity levels and above until 2015." (*Id.*).  Second, the ALJ rejected Dr.

Thomas's 2018 Medical Source Statement because Dr. Thomas's opinion was inconsistent with

"the treatment record showing general stability and no significant exacerbation," as well as with

"another opinion statement [he] completed nine months later." (*Id.*).  Third, the ALJ rejected Dr.

Thomas's 2019 Medical Source Statement because it contained "objective signs, such as

abnormal posture and gait, that are contradicted by the medical records and were not included in

other opinion forms." (*Id.*).

   The Court finds that the ALJ adequately explained his consideration of Dr. Thomas's

opinions and that there is substantial evidence in the record that supports the ALJ's

determination that Dr. Thomas's opinions were not persuasive.  As the ALJ explained, Dr.

Thomas's treatment records explicitly contradicted parts of his own opinions, raising issues of

supportability. (R. 21).  For example, on the 2019 Medical Source Statement, Dr. Thomas

checked off "abnormal gait" as a "positive objective sign" that Plaintiff exhibited since 2013, (R.

833, 838), but his own treatments notes from June 2017 and April 2018 specifically found

Plaintiff "[n]egative for joint swelling and gait problem," (R. 16, 20), and having a steady gait

without assistive device, (R. 17, 21).  In addition, ALJ Carlton identified problems with

consistency among the assessments and other medical records, including the date of onset of

Plaintiff's work-preclusive limitations and Plaintiff's employment history, (R. 21), which

Plaintiff concedes Dr. Thomas would have been "obviously well aware of," (Docket No. 18 at

21).  Therefore, under the relevant regulations, the ALJ properly determined that Dr. Thomas's opinion was not persuasive.

Plaintiff further contends that the ALJ should have reconnected with Dr. Thomas to obtain clarification on the inconsistencies instead of finding his opinions not persuasive. (Docket No. 18 at 22).  "The mere fact that medical evidence is conflicting or internally inconsistent does not mean that an ALJ is required to re-contact a treating physician." *Micheli v. Astrue*, 501 F. App'x 26, 29 (2d Cir. 2012) (summary order).  The ALJ is required to recontact a treating physician "only if the records received were 'inadequate . . . to determine whether [the claimant was] disabled,' which was not the case here." *Brogan-Dawley v. Astrue*, 484 F. App'x 632, 634 (2d Cir. 2012) (summary order) (quoting *Perez*, 77 F.3d at 47).[13]  There is nothing in the medical records that indicate they were inadequate, or that anything was missing.  Therefore, ALJ Carlton was not required to recontact Dr. Thomas before making a determination regarding the persuasiveness of his opinion.

Furthermore, Plaintiff's argument that it was improper for the ALJ to rely solely on the non-examining medical consultant's examination also fails.[14]  (Docket No. 18 at 20).  Even in cases where the treating physician rule applied and the ALJ was required to give deference "to the medical opinion of a [plaintiff's] treating physician" unless proven "inconsistent with other

---

[13] *C.f. Crysler v. Astrue*, 563 F. Supp. 2d 418, 435 (N.D.N.Y. 2008) ("[T]he ALJ was dutibound to recontact [the treating physician] for clarification of his opinions" instead of choosing to "rely upon the opinions of a disability analyst who did not examine the plaintiff," where the ALJ was adjudicating for a pro se claimant, had inaccurately summarized the opinions of that physician, and was limited in a legal framework where "the duty to develop the record [went] hand in hand with the treating physician rule.").  Here, Plaintiff was represented, and counsel stated at the hearing that there were no other records "missing." (R. 57).

[14] The cases Plaintiff cites in support of this argument are inapposite.  They all are analyzed under the prior regulation, in which the opinion of a treating physician was given "controlling weight" as long as it was well-supported by the medical evidence and consistent with other substantial evidence in the record.  (Docket No. 18 at 20).  Moreover, they do not stand for the proposition that it is patently improper for the ALJ to rely solely on a non-examining medical consultant's opinion.

substantial evidence in the record," *Calzada v. Astrue*, 753 F. Supp. 2d 250, 276 (S.D.N.Y. 2010), "the opinions of non-examining sources may override treating sources' opinions and be given significant weight, so long as they are supported by sufficient medical evidence in the record." *Camilo v. Comm'r of Soc. Sec. Admin.*, No. 11 Civ. 1345 (DAB) (MHD), 2013 WL 5692435, at *17 (S.D.N.Y. Oct. 2, 2013); *see also Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995). Moreover, the "new regulations reflect a move away from a perceived hierarchy of medical sources." *Manzella*, 2021 WL 5910648, at *11. The new regulations specifically state that they "do not create an automatic hierarchy for treating sources, examining sources, then nonexamining sources to which we must mechanically adhere," which "help[s] eliminate confusion about a hierarchy of medical sources and instead focus[es] adjudication more on the persuasiveness of the content of the evidence." 82 Fed. Reg. at 5,853 (Jan. 18, 2017) ("[A]djudicators can currently find a treating source's medical opinion is not well-supported or is inconsistent with the other evidence and give it little weight, while also finding a medical opinion from . . . [a] nonexamining source . . . is supported and consistent and entitled to great weight.").

Plaintiff contends that instead of relying solely on Dr. Ahmed's opinion, the ALJ should have had Plaintiff undergo a consultative examination. (Docket No. 18 at 22). This argument is misplaced. "The ALJ has discretion on a case-by-case basis to determine whether a consultative examination is needed, and is only required to order such an examination where the examination is necessary to resolve a conflict or ambiguity in the record." *Phelps v. Colvin*, 20 F. Supp. 3d 392, 401 (W.D.N.Y. 2014) (citing 20 C.F.R. § 404.1519a(b)(4)). Although it is a reversible error for the ALJ to fail to obtain a consultative examination if he is unable to otherwise make an informed decision about Plaintiff's RFC, *Falcon v. Apfel,* 88 F. Supp. 2d 87, 90–91 (W.D.N.Y.

2000), a consultative examination is not necessary if the facts do not warrant or suggest the need

for such an examination, *Taylor v. Astrue,* 32 F. Supp. 3d 253, 269 (N.D.N.Y. 2012) (citing *Cruz*

*v. Shalala*, No. 94 Civ. 0929 (JSM), 1995 WL 441967, at *5 (S.D.N.Y. July 26, 1995)); *see*

*also Simon v. Colvin,* No. 6:12–CV–6381 (MAT), 2013 WL 4094612, at *6–7 (W.D.N.Y. Aug.

13, 2013) (finding no psychiatric consultative evaluation needed where substantial evidence in

the record supports ALJ's conclusion); *Clark v. Astrue*, 826 F. Supp. 2d 13, 25 (D.D.C. 2011)

(refusing to remand for consultative examination when there was "nothing in the record

indicating that the ALJ deemed the evidence insufficient to render his decision.").  The ALJ was

not required to order a consultative examination simply because he found Dr. Thomas's opinions

unreliable, given that there was sufficient evidence in the record to support the ALJ's

determination.  Moreover, Dr. Thomas's own treatment notes were complete and consistent.

 Accordingly, the Court finds that there is substantial evidence in the record to support

the ALJ's determination that Dr. Thomas's opinions were not persuasive.

**2.  The ALJ's Consideration of Plaintiff's Obesity**

Plaintiff contends that the ALJ failed to properly consider her obesity when assessing her

RFC, constituting a failure to comply with Social Security Ruling 19-2p ("SSR 19-2p"), which

requires that in determining the RFC, an ALJ considers the "combined effects of obesity with

[other] impairment(s)" and "explain[s] how [he] reached [his] conclusion on whether obesity

causes any limitations." (Docket No. 18 at 23-25; *see also* Docket No. 21 at 1-3) (citing Social

Security Rule 19-2p: Titles II and XVI: Evaluating Cases Involving Obesity ("SSR 19-2p"), 84

Fed. Reg. 22,924, 22,925 (May 20, 2019)).

Defendant, on the other hand, maintains that the ALJ properly considered Plaintiff's

obesity in his analysis of her RFC, meeting his obligations to consider her obesity when he

"rel[ied] on medical reports that noted obesity and provided an overall assessment of limitations." (Docket No. 20 at 25-26) (citing *Drake v. Astrue*, 443 F. App'x 653, 657 (2d Cir. 2011)).  Defendant cites specifically to Dr. Ahmed's report, in which the doctor noted Plaintiff's obesity with the words "BMI 36.34," (R. 64), and highlights that the ALJ also considered Plaintiff's obesity when he found it a severe impairment and when he "assess[ed] an RFC for a range of light work," (R. 17, 19). (Docket No. 20 at 25).

Although "[o]besity is not a listed impairment[,] . . . the functional limitations caused by the MDI of obesity, either alone or in combination with another impairment(s), may medically equal a listing" or otherwise "increase the severity or functional limitations of the other impairment(s)." SSR 19-2p, 84 Fed. Reg. at 22,926.  Therefore, under SSR 19-2p, an ALJ must "consider all work-related physical and mental limitations, whether due to a person's obesity, other impairment(s), or combination of impairments," and "explain how [he] reached [his] conclusion on whether obesity causes any limitations." *Id*.

Here, Plaintiff is correct that the ALJ does not refer to obesity in the RFC assessment.  In fact, ALJ Carlton refers to Plaintiff's obesity only twice in his decision: (1) when he determines that Plaintiff's fibromyalgia and obesity are "medically determinable impairments," (R. 17), and (2) when he concludes that Plaintiff's obesity had "been considered as required by Social Security Ruling 19-2p" in determining that Plaintiff did not have the equivalent of a listed impairment, (R. 19).

"However, an ALJ's failure to explicitly address a claimant's obesity does not necessarily warrant remand where the claimant's treating or examining sources did not consider it a significant factor limiting his or her ability to perform work related activities." *Negron*, 2021 WL 465768, at *16 (internal quotations omitted) (citing *Drake*, 443 F. App'x at 657); *see also*

*Bonilla-Bukhari v. Berryhill*, 357 F. Supp. 3d 341, 353 (S.D.N.Y. 2019); *Guadalupe v. Barnhart*, No. 04 CV 7644 (HB), 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005).  Courts have held that "the ALJ's obligation to discuss a claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a significant factor in relation to the claimant's ability to perform work related activities." *Bonilla-Bukhari*, 367 F. Supp. 3d at 353 (internal quotation omitted).  As long as the physician's notes or records demonstrate that the condition was recognized, a medical opinion need not specifically use the word "obese" to adequately account for claimant's obesity. *See, e.g., Rivera v. Berryhill*, 1:15-cv-0487-MAT, 2018 WL 375846, at *4 (W.D.N.Y. Jan. 11, 2018) (ALJ did not err in failing to explicitly discuss obesity where consultative examiner noted plaintiff's height and weight, and record contained "sporadic mentions of plaintiff's obesity.").

Here, although the record references Plaintiff's BMI many times, there is nothing in the medical opinions or any other evidence that shows her obesity exacerbated her other impairments or limited her ability to perform work-related activities.  The record indicates a history of obesity, with BMIs consistently measuring above 30, including notes from her OB-GYN about risks of obesity to her health and pregnancy.  (*See* R. 200, 203, 212, 232, 241, 245, 249, 331, 333, 543, 547, 569, 571, 575, 580, 583, 586, 592, 603, 607, 611, 613, 617, 620, 636, 640, 643, 681, 694, 743, 750, 756, 758, 750).  However, the record is devoid of any medical opinions or treatment notes that suggest obesity was causing any work-related limitations.  Dr. Thomas's treatment notes reflect one conversation in which Plaintiff said she had lost 35 pounds in six months from "diet control with salad," (R. 200), but there was no conversation about her obesity or the impact her obesity had on her fibromyalgia or the pain she was experiencing.  The

29

medical records demonstrate that throughout Dr. Thomas's long history as Plaintiff's treating physician, during which Plaintiff was obese, obesity was never marked as an impairment or as a factor in her pain and limitations.  In addition, there is no indication that Dr. Thomas ever recommended or encouraged Plaintiff to treat her obesity.  Furthermore, Dr. Thomas did not discuss any impact obesity had on Plaintiff's alleged disability in his three medical opinions. (R. 216-24, 833-838).  This suggests that Dr. Thomas did not believe that Plaintiff's weight was an exacerbating factor.  On the other hand, Dr. Ahmed noted Plaintiff's BMI in his medical opinion, but did not opine that her obesity impacted her impairments or functioning in any way. (R. 58-66).  Consequently, "the record reflects that plaintiff's treating and consultative examining medical sources were aware of plaintiff's obesity, but there is no indication that any medical source attributed any symptoms, limitations of function, or exacerbation of other impairments to her weight." *Bonilla-Bukhari*, 367 F. Supp. 3d at 353-54 (quoting *Battle v. Colvin*, No. 13-CV-547-JTC, 2014 WL 5089502, at *5 (W.D.N.Y. Oct. 9, 2014)).

Moreover, Plaintiff never included obesity in any of the disability reports submitted in association with her claim, (R. 131-37, 151-80), and she did not mention obesity at the hearing when the ALJ asked her why she could not work, (R. 37). *See Rivera*, 2018 WL 375846, at *4. Furthermore, the attorney who represented her at the hearing did not include obesity as one of the many impairments that Plaintiff claimed prevented her from engaging in substantial gainful activity, (R. 29-30), nor did her attorney question her about her obesity, (R. 48-49).

Accordingly, the Court finds that the ALJ's decision sufficiently accounted for Plaintiff's obesity and remand on this ground is not warranted.

### 3.   The ALJ's Consideration of Plaintiff's Monthly Absences

Plaintiff contends that the ALJ failed to consider the number of monthly absences from work that Plaintiff would require because of her impairments. (Docket No. 18 at 25; Docket No. 21 at 1-3).  Defendant counters that the ALJ did not have to consider her anticipated monthly absences because he had already discounted Dr. Thomas's opinion regarding her absences as not persuasive. (Docket No. 20 at 22-23).

Dr. Thomas estimated in his opinions that Plaintiff would be absent from work more than three times a month. (R. 218, 224, 838).  Plaintiff also testified she was laid off of her last job because she missed work, (R. 37-38), and that she missed days of classes and needed frequent breaks while studying cosmetology in 2016, (R. 43-44).  Failure to address expected absences can constitute legal error.  *See Iglesias-Serrano v. Colvin*, 16 Civ. 418, 2016 WL 7441697, at *8 (S.D.N.Y. Dec. 23, 2016).  However, the record must first show that Plaintiff's impairments cause a limitation in which she would be absent from work a certain number of days per month. *See id.* at *7-8 (describing at length the extensive support in the record for Plaintiff's inability to work without several absences per month); *Gallagher v. Astrue*, No. 10 Civ. 8338(LTS)(AJP), 2012 WL 987505, at *22 (S.D.N.Y. Mar. 22, 2012) (finding the ALJ's failure to address absences was an error when the ALJ had found persuasive the treating physician's opinion that Plaintiff would miss work three times per month).  An ALJ "is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the [Plaintiff]'s credibility as long as 'the evidence of record permits [the Court] to glean the rationale of an ALJ's decision.'" *Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 580 (S.D.N.Y. 2019) (quoting *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013)).

Here, the ALJ clearly found that the "work-preclusive" symptoms and limitations noted in Dr. Thomas's opinions were not supported by the record, in part because Plaintiff had "continued working at substantial gainful activity levels and above up until 2015." (R. 21).  It is evident that the ALJ extensively evaluated the record because he set forth detailed explanations to support his determination that Plaintiff's alleged limitations were not as severe as she maintained and that Dr. Thomas's opinions about her limitations were not persuasive.  Although we will not accept "an unreasoned rejection of all the medical evidence in a claimant's favor," *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir. 1983), "[w]here the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner," *Veino v. Barnhart,* 312 F.3d 578, 586 (2d Cir. 2002).[15]  The medical records routinely documented that, despite times of exacerbation, Plaintiff's fibromyalgia was stable, tolerable, mild, and well managed. (R. 197-98, 210, 212, 214, 296).  Moreover, since the ALJ found Dr. Thomas's opinions were not persuasive, *see supra* Section III.B.1, and Plaintiff's own testimony of her limitations was inconsistent with the medical evidence, *see infra* Section III.C, the ALJ was not required to discuss monthly absences as part of his opinion.

Accordingly, the Court finds that the ALJ did not err in his RFC assessment by declining to discuss monthly absences.

## C.  The ALJ's Evaluation of Plaintiff's Subjective Statements

Plaintiff alleges that the ALJ's findings resulted from the improper rejection of her subjective claims of limitations due to the disabling pain which she experienced. (Docket No. 18

---

[15] *C.f. Murphy v. Barnhart*, 417 F. Supp. 2d 965, 972 (N.D. Ill. 2006) (finding that the ALJ's rejection of the VE's testimony and claimant's testimony regarding claimant's absenteeism was "without explanation," and thus grounds for remand, when the ALJ failed to explain whether he "found that [the plaintiff's] testimony about . . . her absenteeism lacked credibility.").

at 25-28).  Defendant argues that the ALJ properly evaluated Plaintiff's subjective

symptomology and alleged limitations but determined that they were "not entirely consistent

with the medical and other evidence in the record." (Docket No. 20 at 26-28).

An ALJ must consider subjective complaints of pain in making the five-step disability

analysis. 20 C.F.R. §§ 404.1529 (2017), 416.929 (2017).  When examining the issue of pain,

however, the ALJ is not required to blindly accept the subjective testimony of a claimant.

*Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979).  Rather, an ALJ retains the discretion to

evaluate a claimant's subjective testimony and "arrive at an independent judgment . . . in light of

medical findings and other evidence, regarding the true extent of the pain alleged by the

claimant." *Mimms v. Heckler*, 750 F.2d 180, 185–86 (2d Cir. 1984) (internal quotations omitted).

If the claimant's testimony concerning the intensity, persistence or functional limitations

associated with his pain is not fully supported by medical evidence alone, the ALJ must consider

additional factors in order to assess that testimony, including: 1) daily activities; 2) location,

duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4)

type, dosage, effectiveness and side effects of any medications taken; 5) other treatment

received; and 6) other measures taken to relieve symptoms. *See* 20 C.F.R. §§ 404.1529(c),

416.929(c); *see also* Social Security Rule 16-3p: Titles II and XVI: Evaluation of Symptoms in

Disability Claims, 81 Fed. Reg. 14,166 (Mar. 28, 2016).

Where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's

credibility determination "is generally entitled to deference on appeal." *Selian*, 708 F.3d at 420

(citing *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order)).  Thus, "[i]f

the [Commissioner's] findings are supported by substantial evidence, the court must uphold the

ALJ's decision to discount a claimant's subjective complaints." *Aponte v. Sec'y, Dep't of Health*

*& Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (citations omitted); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ....").

During the hearing, Plaintiff testified that she experienced "unbearable" and "unmanageable" pain. (R. 40). Plaintiff also testified that she had pain every day with "just different levels of the pain and areas of the pain daily." (R. 42). She stated that she needed to alternate sitting and standing at work and at school, and that the pain prevented her from working the usual business hours. (R. 37-38, 43-44). Suffering from discomfort, however, does not automatically qualify a claimant as disabled, since "disability requires more than mere inability to work without pain." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).

In his decision, ALJ Carlton addressed Plaintiff's claims of progressively worsening pain and her inability to walk but noted that Plaintiff admitted at the hearing that medication and injections helped manage her pain. (R. 39-42). The record is clear that she received a trigger point injection in 2016 and did not need any more injections. (R. 20, 41, 64, 204). In addition, the ALJ found that Plaintiff's testimony about her limited daily activities, including her inability to lift her son and relying on her relatives to do the cooking and cleaning, and her daily pain intensity, which she rated 8 out of 10, was inconsistent with the treatment records, which noted her fibromyalgia was stable, tolerable, mild and generally well managed with periods of exacerbation. (R. 20-21). Her testimony was also inconsistent with her function report, in which she attested to fixing her own breakfast of cereal, eggs, and toast every day. (R. 167). Consequently, it was within the ALJ's discretion to discount Plaintiff's subjective complaints of pain.

Accordingly, the Court finds that there is substantial evidence in the record to support the ALJ's decision, and therefore, remand is not warranted.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's motion is denied, and the Commissioner's cross-motion is granted.  The Clerk of the Court is respectfully requested to terminate the pending motions (Docket Nos. 17, 19) and close the case.

Dated: March 24, 2022
      White Plains, New York

**SO ORDERED:**

_____
JUDITH C. McCARTHY
United States Magistrate Judge